191 N.J. Super. 426 (1983)
467 A.2d 276
MELVIN FEILER, D.D.S., PLAINTIFF,
v.
NEW JERSEY DENTAL ASSOCIATION, DEFENDANT.
Superior Court of New Jersey, Chancery Division Middlesex County.
Decided July 5, 1983.
*429 Victor A. Deutch for plaintiff (Ravin, Davis & Sweet, attorneys).
Arthur Meisel for defendant (Jamieson, McCardell, Moore, Peskin & Spicer, attorneys).
COHEN, J.S.C.
This suit was brought by New Jersey Dental Association[*] (hereinafter NJDA) seeking a judgment enjoining certain billing practices of Dr. Melvin Feiler and the dental offices he controls (hereinafter, collectively, Feiler). NJDA accuses Feiler of billing insurance carriers and other third-party payers for dental services untruthfully and deceptively in such a way as to cause them to pay him greater amounts than they otherwise would. By defrauding the payers for dental services, according to NJDA, Feiler also enabled himself to promise and deliver to patients significant cost reductions that a competing practitioner can not match unless he adopts Feiler's dishonest means. Both the public and the profession are damaged, argues NJDA, *430 and will continue to be damaged unless Feiler is enjoined.[1] In addition, NJDA concludes, Feiler's activities constitute dishonest and unfair competition from which honest practitioners need and deserve protection.
Issues arising in the suit include (1) whether NJDA had a cause of action against Feiler, (2) whether NJDA has standing to complain of Feiler's conduct, (3) whether NJDA has failed to exhaust administrative remedies in that the New Jersey Board of Dentistry has primary jurisdiction of the matter, (4) whether Feiler has in fact billed insurance carriers and third-party payers deceptively, (5) whether the recipients of Feiler's bills have in fact been deceived and (6) what, if any, remedy is appropriate.

NJDA STATES A CAUSE OF ACTION WHICH IT HAS STANDING TO PURSUE.
NJDA asserts in its complaint that it is a nonprofit corporation whose members include about 90% of the dentists licensed to practice in New Jersey, that Feiler is a New Jersey dentist and that he regularly and continuously misrepresents his fees on statements submitted to insurors and other third-party payers by fraudulently listing a fee higher than the one he actually charges and by receiving payment on that basis. In the first count, NJDA asserts it
is capable and competent to protect the public interest and has filed ... in an effort to protect that interest and to preserve public confidence in the integrity of the dental profession and insurance co-payment plans.
At an earlier stage of this case, I ruled that the quoted assertion of standing was insufficient. I held, in effect, that NJDA had no cause of action solely in behalf of the public interest. I believed that N.J. Bar Association v. Northern N.J. Mortgage Associates, 22 N.J. 184 (1956), was a different case. *431 There, the bar association's complaint was sustained in seeking to bar the unauthorized practice of law by the defendant. Chief Justice Vanderbilt saw the action as having been brought in the public interest by a plaintiff who was "capable and competent to protect the public interest" as opposed to a plaintiff who might seek standing "under the outward pretense of a public service, motivated in fact by selfish purposes." The case is unique because the bar association occupied an especially responsible status in 1956 in a profession with special responsibilities to the public. The holding cannot be applied to every profession in such a way as would give the various professional and trade associations some official responsibility to safeguard the public interest.
After my ruling, NJDA amended its pleadings to assert the private interest of its members in enjoining Feiler. It claimed standing "to protect the private rights of its members against fraudulent and dishonest competition" as well as to assert the public interest in preventing unlawful and deceptive practices.
If practicing dentists competing with Feiler have a cause of action, then NJDA does also. It represents its members' interests. It does not seek to collect damages on their behalf. Cf. N.J. Optometric Ass'n v. Hillman-Kohan, 160 N.J. Super. 81 (App.Div. 1978). It seeks to bar conduct it says is improper and works to the disadvantage of its honest members and the public. Its concern with the subject matter evidences a sufficient stake and real adverseness. Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y., 58 N.J. 98 (1971); Travel Agents Malpractice Action Corps. v. Regal Cultural Society, Inc., 118 N.J. Super. 184 (App.Div. 1977).
NJDA has a cause of action because its individual members have. A practicing New Jersey dentist has standing to complain that another dentist gains an unfair competitive advantage over him by fraudulent billing practices that enable him to promise and deliver cost savings to patients that are unavailable to patients of an honest practitioner. And, if the *432 charge can be proved, the fraudulent billing practices should be enjoined. As Chief Justice Weintraub said in another context: "The reputable vendor ... has a stake in the suppression of dishonest competition." Riley v. New Rapids Carpet Center, 61 N.J. 218 at 225 (1972).
In Travel Agents an association of 14 travel agents stated a cause of action when it charged the defendant with forming bogus affinity groups for the purpose of selling cut-rate charter travel tickets. The plaintiffs asserted that the defendants' conduct violated the IATA contract among travel agents and member airlines and also violated Civil Aeronautics Board regulations. Although Travel Agents involved a contract and a CAB regulation, it necessarily stands for the proposition that a businessman may seek to enjoin a competitor who seeks to attract customers by improperly offering inducements that a law-abiding businessman cannot offer.
United Stations of N.J. v. Kingsley, 99 N.J. Super. 574 (Ch.Div. 1968), held that the operator of a filling station had a cause of action against oil companies and competing filling stations to bar unlawful competitive conduct designed to attract trade in an improper way. The offending conduct was holding give-aways in violation of N.J.S.A. 56:6-2(f). The statute authorized enforcement by the Director of the Division of Taxation but did not mention private lawsuits. United Stations differs from this case in that it involved a statutory prohibition designed to protect the class of which plaintiff was a member. Here, the primary alleged victims are insurance carriers who are not parties to the suit.
United Stations is very like this case, however, in another respect. It recognizes that the law-abiding business deserves protection from a competitor who seeks to attract trade by promising and delivering improper benefits the honest business cannot match. The court said:
If a nonparticipating retailer is not afforded injunctive relief, he is put to an unjustifiable choice as long as he can not persuade the law enforcing authorities to act promptly: he must either violate the law himself or see his business diverted. * * * The common law will, if possible, supply to any deserving *433 businessman relief from undesirable commercial behavior that is both `injurious and transgressive of generally accepted standards of common morality or of law.' [99 N.J. Super. at 583; citation omitted]
It would ignore reality to say that a dentist has no real interest in preventing dishonest competition. Even though he may not be the primary victim of the conduct attributed to Feiler, the harm he suffers is an obvious and designed side effect. If the improper conduct of a competitor gives him an undeserved advantage over the ethical practitioner, a real harm is done which the law has no reason to protect or perpetuate. A court should not have to tell the ethical practitioner that his only effective remedy is to imitate the wrongdoer.[2]
Feiler argues that NJDA has to prove more than the potential diversion of trade from NJDA members. Rather, it must show that NJDA members have actually lost income to Feiler's competition. He sought discovery of NJDA members' income tax returns and office records.
NJDA need not prove so much. Its cause of action does not require showing actual loss of particular patients to Feiler. It is enough to show the existence of deceptive and unlawful billing practices adopted for the purpose of diverting patients to Feiler by promising and delivering benefits unavailable to patients of honest practitioners. The intention and the adoption of means suitable to an evil end suffice. The degree of success is not material.

NJDA HAS NOT FAILED TO EXHAUST ADMINISTRATIVE REMEDIES NOR DOES THE BOARD OF DENTISTRY HAVE PRIMARY JURISDICTION OF THIS MATTER.
The New Jersey Board of Dentistry is the statutory administrative body entrusted with the supervision of the practice of *434 licensed dentists. It has adopted regulations and ethical standards and has the power to discipline dentists who commit infractions. There are general ethical standards that have been adopted by the board that might well prohibit fraudulent billing of insurance carriers. It is therefore possible that the board could entertain complaints against Feiler charging the substance of the conduct complained of here.
A suitor may not bring to a court matters entrusted by the Legislature to the expertise of an administrative agency created for the purpose. Deal Gardens, Inc. v. Board of Trustees of Loch Arbour, 48 N.J. 492 (1967). The Legislature has furnished a remedy in the agency and it must be exhausted before judicial relief can be sought. The same is not true where matters of law are in dispute or matters are raised which do not engage the particular expertise of the agency. In such cases, resort lies directly to a court.
In N.J. Optometric Ass'n v. Hillman-Kohan, 160 N.J. Super. 81 (App.Div. 1978), suit was brought by an association of licensed optometrists. Its principal thrust was that defendant was guilty of violations of specific statutory provisions governing the practice of optometry. There were also charges of antitrust law violations and unfair competition. The court ruled that the association first had to exhaust its remedies before the New Jersey Board of Optometry. This case is very different. First, the acts charged to Feiler may be ethical violations but the primary thrust of NJDA's suit is a civil cause of action for unfair and dishonest competition. There is no specific statutory or regulatory provision on the subject and the issues of consequence are legal in nature. The expertise of the board of dentistry is not engaged by the dispute before the court.
For essentially the same reasons, the board of dentistry does not have primary jurisdiction of the matter. The doctrine of primary jurisdiction instructs a court to decline to exercise the jurisdiction it possesses to hear issues which, under a regulatory scheme, have been placed within the special competence of *435 an administrative body. Daaleman v. Elizabethtown Gas Co., 77 N.J. 267 (1978). Common sense dictates that a case should be heard in the forum best qualified by expertise and relevant law to decide it. Hinfey v. Matawan Regional Bd. of Ed., 77 N.J. 514, 532 (1978). There is nothing in the special education or experience of the members of the board of dentistry that gives them expertise to determine the facts or law in a matter in which a dentist is charged with fraudulently overstating his charges. Whether the practice occurs can be competently determined by a court. Whether the practice ought to be stopped to protect the rights of competing dentists can best be determined by a court. See Nader v. Allegheny Airlines, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). Thus, this court not only has jurisdiction of the matter, but ought to exercise it.

FEILER HAS IN FACT BILLED INSURANCE CARRIERS AND THIRD-PARTY PAYERS DECEPTIVELY.
Insurance for dental expenses frequently contains a "co-payment" provision. It promises that the carrier will pay a fixed percentage of the eligible costs incurred by the covered patient. There are variations. Some plans pay for all basic diagnostic and preventive services. Many provide for special percentage or dollar limits on orthodontic and other costly or optional services. Many provide for annual ceilings on payment for any one covered patient. Some have initial deductible amounts. The bulk of them, however, provide for payment of 70% to 90% of a broad variety of expenses actually incurred by the patient, with 80% being a common level of protection.
Typically, persons covered by copayment plans assign benefits to the dentist, who submits an attending dentist's statement to the insurance carrier for payment. On it, he describes the treatment he rendered and his charge for it. Forms differ from carrier to carrier but they universally call for the dentist to set forth his actual charges to the patient. A common additional requirement is that the charges must be in accordance with the *436 dentist's usual, customary and reasonable fees. Upon approval by the carrier of the dentist's charges to the patient, it pays the dentist the appropriate percentage of his fee. If the patient does not assign benefits to the dentist, he pays for the dental services and applies to the carrier for reimbursement of the appropriate percentage of the amount he actually has paid.
NJDA charges that Feiler's statements to carriers overstate his patient charges because he has already promised the patient that he will not collect the patient's portion of the charges. If, for instance, Feiler does a procedure for which he tells the insurance carrier he charges $100, then collects $80 from the carrier and, by prearrangement, forgives the patient's copayment, he has lied to the carrier. His charge is really $80 NJDA says, and the carrier should pay only $64. Moreover, if he does that as a rule, his usual and customary fee is $80 and not $100. In this way Feiler can promise free or almost free dentistry. To compete, another dentist would have to adopt the same means of billing.
Feiler actually collects his "usual and customary" fee in only about 3% of the cases in his offices. 97% are discounted in one way or another and usually by the amount of the copayment prescribed by the insurance plan. But, he argues, this is not all prearranged. He says the patient's responsibility is for the gross fee he quotes. The copayment is forgiven an insured patient only upon receipt of the carrier's portion of the fee. An uninsured patient gains his substantial discount only by living up to a prearranged prompt payment plan.[3]
I granted summary judgment declaring that Feiler's statements to insurance carriers are untrue on their face. I did so on the following findings of fact:

*437 (1) A substantial part of Feiler's practice involves patients whose treatment charges are submitted for payment by insurance carriers.
(2) A substantial part of the payments by carriers are made on the basis of "copayment" agreements, which say that the carrier will pay an agreed percentage of the dentist's charges.
(3) The dentist's charges, a percentage of which the carriers will pay, are the charges actually made by the dentist to the patient, conforming to his or her usual and customary fees.
(4) Feiler has a schedule of usual and customary fees according to which charges are entered in his statements to carriers.
(5) Only about 3% of Feiler's patients pay his usual and customary fees. That percentage is made up of those patients whose insurance turns out not to cover the treatment and uninsured patients who fail to meet agreed prompt payment terms.
(6) All Feiler patients are offered discounts from his usual and customary fees. Those few patients who do not ultimately receive discounts are those whose payment plans are not met for one reason or another.
(7) Forgiving copayments is the practice of accepting the payment of the carrier, which is a percentage of the charge entered in the statement, and waiving the additional percentage that would otherwise be due from the patient.
(8) Subject to a minimum acceptable percentage of insurance reimbursement, usually 70%, Feiler intends to forgive co-payment in all cases in which he submits to a carrier (whose agreement provides for percentage copayment) a statement of patient charges. Said forgiving takes place in all cases upon receipt by Feiler of the carrier's percentage payment (subject to a minimum acceptable percentage). It does not take place only in those infrequent cases in which the insurance payment is not forthcoming.
(9) All uninsured patients qualify for a percentage discount from Feiler's usual and customary fees. They need only make prompt payment satisfactory to Feiler to qualify for the discount.
(10) Feiler publically announces and encourages unions loyal to him to announce that he forgives copayments and grants discounts for dental work that does not for one reason or another qualify for insurance payment.
(11) There are some third-party payments that are not made on a copayment basis. There are some third-party payers that pay on a basis other than a portion of the dentist's usual and customary fees.
Feiler says that his schedule of charges represents what the patient actually owes unless a satisfactory percentage payment is made either by a third-party payer or promptly by the patient. Thus, he says, only events that occur after billing can diminish or cancel the patient's obligation to pay the scheduled charges. The trouble with Feiler's position is that the "condition subsequent" is satisfied in about 97% of the cases. More significantly, the condition is satisfied in 100% of the cases in which third-party *438 payers actually make satisfactory percentage payment. And Feiler intends that result. The fact is that, even on his own explanation, Feiler's usual and customary fees apply only to those few cases in which payment plans are disappointed. Those fees are therefore not usual and not customary. And they do not represent actual charges to patients.
Feiler's statements to a third-party payer whose agreement includes a copayment feature appear to be untrue on their face.[4] A dentist's statement that asserts he charges $100 for a procedure is untrue if he intends to forgive copayment upon receipt of $80 and if he almost always receives such part payment. Such a dentist's statement enables its author to achieve an advantage over other dentists by relieving the patient of the burden of his copayment.
The untruth of such a dentist's statement is highlighted by a comparison. If the insurance payment were not assigned to Feiler, the patient would pay him and seek reimbursement from the carrier. If he had paid Feiler an agreed fee of $80 for a dental procedure, he could not truthfully submit to the carrier a *439 statement that the fee was $100 in order to gain reimbursement of $80. There is no relevant difference between that case and the case in which the dentist, to whom benefits are assigned, states his fee to be $100 when he intends to be satisfied with a payment of $80.
Summary judgment was not granted declaring that Feiler's untrue statements to insurance carriers were fraudulent. That conclusion would require proof that the carriers were in fact defrauded, i.e., that they were deceived by the statements, and relied on them to make payments to Feiler. That matter was hotly disputed. Feiler contended the carriers were fully aware of his billing practices, and either tolerated or encouraged them. I found the matter incapable of resolution on summary judgment and held a plenary hearing.
Brief recapitulation is necessary at this point. In order to say whether Feiler's billing methods constitute dishonest competition, one must decide whether they give him a competitive advantage over other practitioners, and whether that competitive advantage is one the law should bar. If his advantage is gained by improper means and other dentists can match it only by also employing improper means, it should be barred. In that connection, reference should be made to the elements of common law fraud. They are a false representation, by one who knows or believes in its falsity, the intention that others act thereon, reasonable reliance by others, and resulting damage. Louis Schlesinger Co. v. Wilson, 22 N.J. 576 (1956). In the absence of some special consideration, the absence of any one of the elements should bar a finding of dishonest competition based on fraudulent billing to achieve a competitive advantage.
Doubtless, Feiler's methods give him a competitive advantage. They permit him to relieve patients of the burden of cash outlays that copayment plans normally require. To the patient, Feiler's services are free or much reduced in cost. All other things being equal, patients will be attracted to a dental office that offers services that are, to them, free or cheaper than *440 elsewhere. There is nothing wrong, of course, with offering dental services at reduced prices. It is the mechanism of price reduction that is in issue. If the method works by shifting cost away from the patient and, fraudulently, onto the shoulders of another payer, honest competitors for patients may be unfairly disadvantaged.
I have already found some of the elements of fraud. It is apparent that Feiler makes false representations of the amount of his fees when billing carriers and other third-party payers.[5]
It is also clear that Feiler knows his statements of fees are false. They say he charges an amount which the evidence plainly shows he does not intend to collect. It is equally obvious that he intends that the payers will rely on his representations, i.e., that they will make payments to him of amounts based on his stated fees.
There can be no question but that a payer is injured by making payments based on agreed percentages of Feiler's false fee statements. The simple fact is that the payments are higher than they would otherwise be and that is injury enough. Feiler makes two contrary arguments. The first is that the carriers lose nothing because they can recover the extra cost in higher premiums. It is an odious argument that might be employed by an arsonist to calm a fire insurance company or a shoplifter to reassure a retailer. One's ability to spread a risk of loss does *441 not make the loss disappear. It merely permits one to involve a greater number of victims.
Feiler's other argument is that his billing method makes dental care more accessible to lower income people and encourages them to seek basic dental services. The result, he argues, is the avoidance of more costly services otherwise necessitated by dental neglect, and a net overall savings to the dental insurers. The thesis was announced in the testimony produced by Feiler, but no effort was made to prove it.[6] If it is true, it is irrelevant. Dental insurers are entitled to write policies containing copayment provisions. Whether or not copayment encourages more conservative use of dental services or achieves some other lawful goal, the carriers are entitled to write a copayment provision and to enforce it. If it is a socially undesirable provision, it is up to government to bar its use. It is not up to dentists to tiptoe around it by overbilling.
The only element of fraud that generated the need for a plenary hearing was that of actual deception and reasonable reliance on Feiler's billing statements. Such a hearing was held. The conclusions follow.

THE INSURANCE CARRIERS AND OTHER THIRD-PARTY PAYERS WITH COPAYMENT PLANS HAVE IN FACT BEEN DECEIVED BY FEILER'S BILLING STATEMENTS.
There was a good deal of testimony on the question whether carriers and other payers really relied on Feiler's statements. His witnesses stood for the thesis that everyone knew that Feiler was waiving copayments and that they willingly went along with his billing methods. NJDA's witnesses were to the *442 contrary. Their testimony was to the effect that the carriers and other payers assume the truth of dentists' statements and pay accordingly unless they have specific proof of improper billing. Despite some fragmentary indications of irregularity on Feiler's part, the witnesses swore their companies had no proof of fraudulent bills, and at least until recently, have paid Feiler on the basis of his statements.
Feiler deals with scores of insurance companies. His case that they were aware of his billing methods relied on three areas of proof. The first was that in 1980 a letter went out of his office, on the advice of counsel, informing the carriers of exactly what his methods were. The second was that over the years he and his business people met with carriers and discussed his waiver of copayments. The third was that waiver of copayments is a growing way of doing business and the carriers know of its existence from sources unrelated to him.
The proofs regarding the letter to the carriers were strange. A copy of the form letter was produced. It is an almost impenetrable linguistic maze. It is peculiarly unsuited to the simple task of advising that Feiler was waiving copayments as a regular matter. In addition, there was no record ever made of when the letters were sent, or by what means, or whether any effort was made to document their receipt, or how many were sent, or even to whom they were sent. The form letter itself is undated. That is a disquieting way of handling things on advice of counsel, in the opening stages of important litigation, in an office that, in so many other respects, was a model of sophisticated record-keeping and operating systems. The testimony about the letter and its offhand distribution came from Joel Sharenow, Feiler's fulltime financial and business consultant. Throughout his testimony, Sharenow exhibited a variable and convenient memory on a number of subjects. All in all, the evidence is far from convincing that the letter ever went out of Feiler's office to any one of the carriers.
*443 Testimony was adduced from Sharenow, from Dr. Harold Kelsey, codirector of one of Feiler's Eastern Dental Centers, Dr. Joseph Hanna, fired marketing director of New Jersey Dental Service Plan and later free-lance consultant for Feiler, Burton Lutsky, a Feiler administrator, and others. Much of it concerned meetings involving Feiler and his people, and representatives of Prudential, Connecticut General, Aetna, Blue Cross-Blue Shield and other major carriers and payers. Some of the testimony was inconsistent. Significantly different versions of the same meeting came from the Feiler witnesses who attended. Sharenow's memory was oddest of all. He recalled important details of one meeting and the roles played by the various participants. At a deposition only two months or so after the meeting itself, he had no recollection of what had occurred there. At the deposition, he neglected even to mention two other important meetings that he described in detail at trial, because, he said, he did not think of them. In the interim Feiler, who did not testify before me at all, reminded him about those meetings. In other matters, too lengthy to recall, Sharenow gave courtroom testimony that varied in important and unexplained ways from both his deposition testimony and the testimony of other witnesses. He was a thoroughly unreliable witness. Much of the testimony about the meetings was refuted by the insurance company people who attended. Even if true, the accounts of Feiler's people were mostly of vague and passing references to waiver of copayment. Those references would not have alerted hearers that Feiler was consistently and regularly waiving.
Other witnesses were current Feiler employees who formerly sold plans for carriers or other third-party payers. They uniformly said that they knew as insurance salesmen that Feiler and others were waiving copayments and that they sold group policies to union locals on that basis. I strongly suspect that the witnesses overstated their case. They were currently allied with Feiler. Their loyalty to his interests was clear. Nevertheless, I believe that, in recent years, some group-sales departments of *444 certain carriers have been aware of the practice of waiver of copayments. The reason is that sales to labor locals are a substantial part of group business and it is evident that some locals seek and receive promises of waiver from dentists in return for publicized endorsements. There was no reliable evidence before me at all, from Feiler's witnesses or the insurance people who testified, that there was any knowledge or acceptance at higher levels in the carriers of waiver of copayment. The credible evidence was quite the other way.
Various insurance people testified about the carriers' reaction to waiver. It is something they have had difficulty with. Carriers are in the habit of taking a dentist's statement at face value. Even if a problem appears, a plausible explanation from the dentist will be sufficient to end any inquiry. Some carriers have had suspicions that Feiler was waiving copayments. Patients were questioned and found to be uncooperative. There were inquiries of Feiler and his business people. Feiler's position, as long as he was able to maintain it, was that, although he waived copayment in special cases from time to time, there was no wholesale or prearranged waiver for the benefit of insured groups. That was not true. It was intended to deflect carrier inquiries and for a remarkable period of time it was effective in doing so. I am satisfied, for example, that Lutsky answered an Aetna Life Insurance Co. inquiry with the untrue statement that Feiler did not regularly waive copayment. The inquiry was about a split-funded plan administered by Aetna for Ford for a large midwestern local. Eventually Aetna and Ford satisfied themselves that Feiler was waiving copayments and reduced payments to him. I am also satisfied that Connecticut General Life Insurance Co. pays Feiler on the basis of his statements, despite suspicions that they are untrue, because of an inability to confirm with Feiler the billing methods he employs. I am also satisfied that Medical-Surgical Plan of New Jersey (Blue Shield) made two inquiries. In 1980, Lutsky satisfied the inquirer that Feiler bills for the balance of his bills. He was not telling the truth. In February 1983 a second inquiry was made. *445 Feiler's people admitted that they do not attempt to collect copayments. By that time, sufficient evidence had been uncovered in discovery in this case to make further denials impossible.
The insurance carriers that have become aware of the problem have dealt gingerly with waiver of copayment by Feiler and the few others who do it. It is a business method that has received obvious approval of labor locals. It is difficult to deal with suspicions of overbilling that, upon inquiry, are flatly denied. It is difficult because the information necessary to deal with the problem is hard to come by. The problem is made even more difficult by the fact that it is not clear what ought to be done with the information once it is uncovered. It is not certain that reluctant toleration of minor filching is not preferable to making a fuss and losing the entire group policy next year. Aetna has even found that upon advising employers who fund their own dental plans of the existence of waiver of copayments, some have reacted by deciding to absorb the cost and telling Aetna not to take any action. Since 1980, the problem has been greatly increased by the pendency of this law suit and the reaction it surely created that action should await a final judicial determination as to whether Feiler's billing method is lawful.
The total picture is not a clear one. Some things one may be confident of. Although some of the major carriers have had suspicions that Feiler regularly waived copayments, he just as regularly denied it. Until recently, his uniform position was that he billed for the balance except in certain special cases of hardship and the like. He and his employees regularly lied to carriers and other third-party payers. He relied on the inertia of the carriers and others. The major carriers, on the other hand, acted indecisively. They were not sure what to do with Feiler's uniform denials. They were not sure where their real interests lay. Only recently have some of them begun to take action to reduce payments to Feiler.
*446 What of the scores of carriers whose representatives did not testify? They continue to pay Feiler based on his statements. They received no notification from his office as to his billing methods. There is no reason to believe that any one of them is aware of his methods. Although waiver of copayment is a problem that may have attracted attention in trade periodicals, there is no reason to suppose the carriers have focussed on Feiler as one of the sources of the problem. In short, it appears that the great majority of carriers and third-party payers with copayment plans continue to make payments in reliance on the truth of Feiler's overstated billing.
If the total picture is not a clear one, it is clear enough to dispel the image that Feiler has tried to depict, namely, an insurance industry that understands both the mechanism and the consequences of waiver of copayment and has decided to accept them. While there has been some indecision, it is indecision over what to do with a problem whose ramifications are unclear and whose legality has been in the midst of litigation.
The simple facts remain that Feiler does not tell the truth on his billing statements, that carriers largely rely on them and pay on the strength of them, that Feiler achieves a competitive advantage by offering what appears to be free or reduced price dentistry, and that the only way for honest practitioners to equalize is to adopt his unsavory approach. That is a choice the law should not demand of honest professionals.

REMEDY
The appropriate remedy is one that will assure that the carriers and other third-party payers will have sufficient information on Feiler's billing methods to enable the payers to decide how to deal with them. Judgment will be entered ordering that, when billing any carrier or third-party payer with copayment features after July 15, 1983, Feiler will either

*447 (a) enter on the attending dentist's statement a fee in the amount he actually intends to collect for the procedure billed for upon the assumption that the recipient of the statement will treat the procedure as a covered dental expense,
or
(b) type, print or stamp on the face of the statement, or on a label affixed thereto, in legible characters at least ten points in height, the following words: WE WAIVE COPAYMENTS. IT IS OUR INTENTION EITHER TO (Check One)
() BILL THE PATIENT $ ____ AFTER RECEIPT FROM YOU OF $ ____.
() WAIVE ANY FURTHER PAYMENT FROM THE PATIENT AFTER RECEIPT FROM YOU OF $ ____.
This order will require only that Feiler plainly reveal what is actually happening in his billing procedures. If one or another of the carriers or other payers is already aware of Feiler's procedures and wishes the above language omitted from his statements it need only enter at the foot of a copy of this order the words, WE HAVE REVIEWED THE WITHIN ORDER. WE PREFER THE LEGEND REQUIRED BY THE COURT BE OMITTED FROM STATEMENTS SUBMITTED TO US, and have the signature affixed of an authorized officer. Upon filing with the court of the augmented copy of the order, Feiler may omit the legend from future statements submitted to that company.
NOTES
[*] It is actually a counterclaim. Suit was first brought by Dr. Feiler to bar NJDA from suspending his membership. It was later voluntarily dismissed. NJDA's counterclaim for injunctive relief was tried and is decided here.
[1] Feiler controls corporations operating six dental centers. Five are in New Jersey and trade as Eastern Dental Centers. One is in Michigan and trades as Midwestern Dental Center. There are well over 100 chairs in all.
[2] I am aware of Lipman v. Foreman, 138 N.J. Eq. 556 (Ch. 1946) and Mosig v. New Jersey Chiropodist, Inc., 122 N.J. Eq. 382 (Ch. 1937). Unlike this case, they both involve the focal purposes of a professional licensing board. Even so, I am not sure they were correctly decided. Cf. Greenspan v. A.B.C. Div., 12 N.J. 456 (1953).
[3] Feiler and his business associates actively court the endorsement of union locals. A significant inducement to such an endorsement is Feiler's promise to forgive copayments. Letters of endorsement, composed and produced by Feiler, are distributed at his expense over the local leaders' signatures. The letters, with more or less indirection, promise waiver of copayment.
[4] Insurance companies and other third-party payers, which can be self-insured plans or service plans, can contract to pay on bases other than percentage copayment. One frequently used basis is a table of allowances. The dentist submits his statement including the amount of his charges. If his charges equal or are less than the amount allowed for the procedures billed for, payment will be made in the amount of the dentist's charges. The potential exists for abuse of this system. If a dentist overstates the amount of his actual charges or overstates the amount he customarily charges for the procedure, the payer may pay more than it contracts to pay. NJDA charges that Feiler is guilty of overstating his charges to table-of-allowance payers. This is a matter outside of the scope of this opinion. I make no ruling as to whether Feiler improperly bills those payers because NJDA has no standing to bring the matter to the court's attention. Its standing here relates to the competitive advantage derived by Feiler from his allegedly relieving patients of the duty to make copayments without revealing that fact to the payers who expect copayments to be made. I do not understand the same competitive advantage to be available from overstating charges to table-of-allowance payers. They may be deceived by the practice, but the competing dentists are not prejudiced by it.
[5] The California Attorney General had trouble with this element in Op.Cal. Atty.Gen.No. 81-304 (1981). It is hard to say exactly what factual material was before him at the time. He concluded that a dentist does not misrepresent if he submits a claim for his "usual fee" without revealing that he will waive copayments. "Usual fee" is a vague term, according to the opinion, and is not one that clearly includes or excludes copayments. The position is difficult to justify. If a dentist knows not only that his stated fee is higher than he actually intends to charge, but also that the carrier will pay on the overstated fee, it seems simple enough to say that his fee statement is false. An ambiguity is injected only if the dentist's statement does not represent that the "usual fee" is also the fee to be charged the particular patient. But that representation is clearly and necessarily made by the dentist's statements shown by the evidence before me to be in common use in the industry.
[6] Feiler did prove that, in the first few years of dental insurance, utilization starts high and decreases. That is a different matter altogether from the thesis that free dentistry is ultimately cheaper to the carrier than shared payment dentistry.