[No. A036048. First Dist., Div. Three. Apr. 6, 1988.]

SUSAN REYNOLDS et al., Plaintiffs and Appellants, v. CALIFORNIA DENTAL SERVICE et al., Defendants and Respondents.

COUNSEL

Martin J. Jarvis, A. Curtis Sawyer, Jr., Jarvis, Miller, Brodsky & Baskin, Richard J. Archer, Kristina Hanson and Archer & Hanson for Plaintiffs and Appellants.

M. Laurence Popofsky, Robert A. Rosenfeld, Peter F. Sloss, Meryl Macklin, Heller, Ehrman, White & McAuliffe, Pepper, Hamilton & Scheetz, Jesse D. Miller and Peter H. Mason for Defendants and Respondents.

## OPINION

WHITE, P. J.—Plaintiffs and appellants filed suit against defendants and respondents California Dental Service (CDS) and California Dental Association (CDA). The suit alleged that respondents were guilty of illegal price fixing under sections 16720 and 16750 of the Cartwright Act. (Bus. & Prof. Code, §§ 16720, 16750.) The trial court issued a 41-page opinion granting respondents' joint motion for summary judgment,[1] finding no issues of material fact that CDS's practices were actionable.[2] Appellants appeal from this order. We find the trial court's analysis to be thorough and well-reasoned, and its resolution of the issues to be correct. Accordingly, we affirm the judgment.

## I. *Facts*

### A. The Parties

Plaintiffs and appellants are a certified class of persons who received dental services under CDS plans which require a patient copayment. The trial court refused to certify a class of all dental patients in California who received dental care from CDS dentists pursuant to plans other than CDS which require a patient copayment.[3]

---

[1] The motion for summary judgment was predicated on appellants' offer of proof of evidence they intended to present to a jury. (See fn. 6, *infra*.) The court noted that the offer of proof procedure "constitutes a departure from the normal standard that applies to a motion for summary judgment. [Citations.]" In characterizing the motion, the court explained that the motion "partakes of a motion for non-suit as well as a motion for summary judgment, . . ." "[I]n either event," said the court, "the issues and the evidence are now before the court in a manner that permits evaluation of whether triable issues of fact are present and, if so, precisely what they are."

[2] CDA joined in CDS's motion for summary judgment and filed its own such motion. The separate motion contended there was no triable issue that it had, as appellants alleged, conspired with CDS to fix prices. Finding no triable issues that CDS's practices were actionable under the antitrust laws, the court had no need to, and did not, rule on CDA's separate motion for summary judgment. As we find the court correctly ruled on CDS's summary judgment motion, we also need not consider the issues appellants raise concerning CDA's role.

[3] We need not consider appellants' contention that this ruling was erroneous since we conclude the court correctly granted summary judgment on the merits.

CDA is a California nonprofit corporation representing California dentists. It is the primary voluntary professional association of dentists in California.

CDS was formed by CDA in 1955. CDS is a specialized health care service plan under the Knox-Keene Health Care Service Plan Act of 1975. (Health & Saf. Code, § 1340 et seq.)[4] This Act authorizes it to arrange for the provision of dental services to subscriber groups in return for a prepaid or periodic charge paid by such groups. (Health & Saf. Code, § 1345, subds. (f), (n).) Most subscriber groups are employers and trust funds. Agreements between CDS and these groups are called "subscriber contracts." CDS also contracts with individual dentists to provide services to subscriber group members. These contracts are called "provider contracts."

Approximately 90 percent of the dentists in California participate in CDS. However, CDS provides only about 15 percent of the dental services in the State. Most Californians who do not belong to a CDS subscriber group are either uninsured or have coverage for dental services through other prepaid service plans or private insurance.

The main difference between CDS and private insurance is that CDS provides its subscribers with services in kind (i.e., CDS purchases dental services for its subscribers) whereas insurance companies operate on a fee-for-service basis (i.e., insurance companies indemnify the insured for the cost of dental services). Another difference is that CDS pays the dentist an agreed upon percentage of the dentist's actual charges while insurance companies calculate benefits either according to a table of allowances for specific services or by a fixed percentage of what the insurer determines is the dentist's usual, customary and reasonable fee.

B. CDS Dental Plans

The terms of subscriber contracts vary from subscriber to subscriber. The subscriber chooses which dental services will be covered and the percentage of the charges CDS will pay. Some contracts call for CDS to pay 100 percent of the cost of the services. Most contracts provide that CDS will pay some lesser percentage, typically, 80 percent of the dentist's fee. Such contracts will specify the corresponding percentage of the payment to be made by the patient. These patient payments are called "copayments." Most subscribers choose a plan requiring less than 100 percent CDS pay-

---

[4] Health care service plans are intended to achieve a variety of goals, from assuring knowledge of and access to health and medical services at the lowest possible cost, to promoting the prosecution of those who make fraudulent solicitations or use deceptive practices. (Health & Saf. Code, § 1342.)

ments because such plans cost the subscriber less. In addition, a copayment tends to keep down costs by reducing the patient's incentive to overuse dental services. The subscriber's cost is determined by the extent of the services for which it contracts and the percentage of the services which CDS will pay.

## C. The Nonwaiver of Copayment Provision

Appellants challenge two of CDS's practices. The first of these is a provision contained in CDS's provider contracts. It states that when the subscriber contract requires the patient to pay some portion of the dentist's fee directly to the dentist, the dentist must "charge and make reasonable efforts to collect from an eligible patient the entire amount payable by the patient under the applicable CDS group care contract . . . ." A related provision states that the fee charged by the dentist and reported to CDS does not include "any portion of such fee which is discounted, waived, rebated or which the Dentist does not in good faith attempt to collect."

## D. The Usual Fee Rule

The second challenge is to the rule that CDS will not pay a dentist for a service more than he or she actually charged or usually charges for that service. If the dentist charges different amounts for a specific service, the usual fee is the lowest amount regularly charged or offered to patients. The effect of this rule is that CDS will not pay a dentist more than he or she charges a non-CDS patient. This rule does not prohibit a dentist from charging a CDS patient less than a non-CDS patient.[5]

## II. *The Trial Court's Ruling*

The trial court first decided that it would apply the rule of reason to judge the legality of CDS's practices rather than finding them to be per se illegal. The court then addressed appellants' various contentions,[6] the first of which

---

[5] The usual fee provision is only one limitation on the amount CDS will pay a participating dentist. Other limitations are that CDS will accept only those fees which are customary within the range of fees of 90 percent of the dentists in the geographic area in which the dentist practices. A third limitation is that the fee must be reasonable. The question of reasonableness can arise when a dentist charges a higher than usual one-time fee because of the circumstances involved in the procedure. Together, the three limitations are referred to as Usual, Customary, Reasonable, or "UCR" system. Only the "Usual" aspect of this system is challenged in this case.

[6] The trial court endeavored to clarify the nature of appellants' attack against CDS. The court first required appellants to file a binding designation of the acts appellants contended were unlawful. The parties subsequently stipulated that appellants would file a detailed offer of proof of the claims they intended to submit to the jury. In its decision, the court com-

was that CDS was formed for the unlawful purpose of fixing prices. The court acknowledged that there was some evidence to substantiate this contention, which, together with the fact that more than 90 percent of California's dentists belong to CDS, raised the potential for anticompetitive restraints. However, CDS's formation did not provide a basis of recovery. First, an attack on the formation of CDS in 1955 was barred by the statute of limitations. More importantly, the appropriate focus was on the effects of CDS's practices rather than the intention of its founders. Further, in authorizing provider-controlled medical prepayment plans (see Bus. & Prof. Code, § 16770, subd. (g); Health & Saf. Code, § 1342.6), the Legislature intended to permit the existence of such entities despite their potential for competitive harm.

The trial court proceeded to find that CDS was entitled to summary judgment on both alleged antitrust violations. The court found no evidence that the nonwaiver provision was anticompetitive.[7] As to the usual fee rule, the court found that there was a triable issue of fact whether this rule was a restraint of trade; however, there was no proof that the class was damaged by this practice.[8] Appellants challenge each unfavorable determination of the court's ruling.

■ We first review the court's application of the rule of reason standard as this determination was critical to its finding that CDS's practices were not actionable.

## III. *Standard of Review*

### A. The Issue

■ ■ ■ ■ ■ The United States Supreme Court has evaluated allegedly anticompetitive practices by two standards.[9] The basic test is the rule of reason. This test is intended to allow courts to strike down only those restraints on trade which are unreasonable. (*National Bancard Corp.* (*NaBanco*) v. *Visa U.S.A.* (11th Cir. 1986) 779 F.2d 592, 597.) Under the rule of reason, the court inquires into the nature and history of the restraint, as well as other relevant considerations. (*Arizona* v. *Maricopa County*

---

plained that it had difficulty comprehending appellants' precise theories and which of CDS's practices allegedly violated the Cartwright Act.

[7] The trial court also ruled that two other practices of CDS were not anticompetitive. Appellants have not renewed these claims here.

[8] The trial court's discussion of these issues is presented in greater depth in the sections of this opinion in which these contentions are considered.

[9] Reliance on federal authority in interpreting the Cartwright Act is accepted since the latter is modeled after the Sherman Act. (*Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 925 [130 Cal.Rptr. 1, 549 P.2d 833].)

*Medical Society* (1982) 457 U.S. 332, 343 [73 L.Ed.2d 48, 58, 102 S.Ct. 2466]; *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 854 [94 Cal.Rptr. 785, 484 P.2d 953].)

 The Court, however, has deemed some practices per se illegal. This standard applies to "certain agreements or practices [that] are so 'plainly anticompetitive,' [citations], and so often 'lack . . . any redeeming virtue,' [citation], that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases." (*Broadcast Music, Inc.* v. *CBS* (1979) 441 U.S. 1, 8 [60 L.Ed.2d 1, 9, 99 S.Ct. 1551].) The line between these standards is vague. In deciding on the proper standard, the court should inquire into whether " 'the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead one designed to "increase economic efficiency and render markets more, rather than less, competitive." ' " (*Id.,* at pp. 19-20 [60 L.Ed.2d at p. 16]; *National Bancard Corp. (NaBanco), supra,* 779 F.2d at p. 599.)

### B. The Trial Court's Analysis

 The trial court offered two reasons for choosing the rule of reason over the per se standard. First, CDS was a partially integrated plan within the definition set forth by the Federal Trade Commission, and the Federal Trade Commission has stated that such plans should ordinarily be judged under the rule of reason. Second, in enacting Business and Professions Code section 16770, subdivisions (e) and (g), the Legislature may have mandated that the rule of reason be used. The court also factually distinguished *Arizona* v. *Maricopa County Medical Society, supra,* 457 U.S. 332, a case in which the Supreme Court invalidated the practices of an association of doctors as a per se violation of the antitrust laws. We find the court's analysis of the applicable standard to be correct.

### C. The Trial Court's Analysis Was Correct

### 1. The Supreme Court and Federal Trade Commission Authority

 The Supreme Court has declared that " '[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations . . . .' " (*Broadcast Music Inc.* v. *CBS, supra,* 441 U.S. 1 at p. 9 [60 L.Ed.2d at p. 10].) Here, neither the federal nor California courts have had much exposure to the antitrust implications of prepaid medical plans. The one reported case in which the CDS plan was challenged applied the rule of reason. (*Davidowitz* v. *San Diego County Dental Society*

(S.D.Cal. 1983) 1983-1 Trade Cases (CCH) ¶ 65,231, 69,362, 69,364.) Further, the Federal Trade Commission has adopted a case-by-case approach to such plans, noting that it ". . . wants to have greater experience with the market dynamics of the health care industry and the physician-plan relationship before determining whether these general inferences of anticompetitive conduct and effects are warranted. If empirical studies or future investigations or cases indicate that physician control combined with market power customarily leads to higher physician fees, the unreasonable exclusion of competitors, the loss of potential competition, or other significant anticompetitive effects, the Commission will consider appropriate enforcement action based solely on market power and physician control." (Federal Trade Commission, Enforcement Policy With Respect to Physician Agreements to Control Medical Prepayment Plans (1981) 1033 Antitrust Trade Regulation Reporter (BNA) I-1, I-8 (hereafter cited as FTC).)

The Supreme Court has also been "slow to condemn rules adopted by professional associations as unreasonable *per se* [citation], and, in general, to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious [citation]." (*FTC* v. *Indiana Federation of Dentists* (1986) 476 U.S. 447 at pp. 458-459 [90 L.Ed.2d 445, 457, 106 S.Ct. 2009].) It is not clear that medical prepayment plans are anticompetitive. The Federal Trade Commission has stated that such plans can have a procompetitive effect on the market for delivery of health care services. (FTC, *supra,* at p. I-1.) While the dentists who gave declarations for appellants stated they were inclined to charge less for dental services by waiving the patient copayment, CDS provided declarations of dentists who stated that the nonwaiver provision helps to keep down dental fees by discouraging overutilization. Declarations were submitted that without the copayment, the subscribers would pay more, resulting in either higher premiums or reduced coverage to the employee. Additionally, the usual fee requirement does not fix prices at any specific level, and while it may have the potential to discourage discounting, it does not prevent discounting. It therefore does not appear that the challenged practices are so "plainly anticompetitive" or lacking in "any redeeming virtue" that they should, without further inquiry, be declared illegal.

In its lengthy analysis of the antitrust implications of prepayment medical plans, the Federal Trade Commission declared that in most cases partially integrated plans should be judged under the rule of reason. (FTC, *supra,* at p. I-1.) By partially integrated, the Federal Trade Commission meant that the participating providers are in competition with each other and have either partially integrated their practices or made a substantial financial contribution to support the establishment or operation of the plan.

(*Ibid.*) [10] CDS is a partially integrated plan as the dentists contributed more than $6 million to form it and its participating dentists are at risk should CDS suffer financially.[11] Therefore, the court's use of the rule of reason was consistent with the FTC's approach to prepaid medical groups such as CDS.[12]

## 2. Legislative Intent

■ A principle consideration in determining whether to apply the rule of reason or per se standard is whether the practice tends to restrict competition or, rather, is designed to promote economic efficiency and competitiveness. (*Broadcast Music, Inc.* v. *CBS, supra,* 441 U.S. at pp. 19-20 [60 L.Ed.2d at p. 16].) ■ The California Legislature has declared that health care service plans do promote efficiency and competitiveness. In authorizing the formation of such plans, the Legislature explained that such plans further the delivery of "high-quality health care coverage in the most efficient and cost-effective manner possible." (Bus. & Prof. Code, § 16770, subd. (a); Health & Saf. Code, § 1342.6.) The Legislature further found that "the formation of groups and combinations of institutional and professional providers and purchasing groups for the purpose of creating efficient-sized contracting units represents a meaningful addition to the health care marketplace." (Bus. & Prof. Code, § 16770, subd. (d); Health & Saf. Code § 1342.6.) In light of these findings, the Legislature declared that "the formation of groups and combinations of providers and purchasing groups for the purpose of creating efficient-sized contracting units be recognized as the creation of a new product within the health care marketplace, and be subject, therefore, only to those antitrust prohibitions applicable to the conduct of other presumptively legitimate enterprises." (Bus. & Prof. Code, § 16770, subd. (g); Health & Saf. Code, § 1342.6.)

Since the Legislature intended to authorize the formation of groups such as CDS, and given its directive that such arrangements be considered "pre-

---

[10] A partially integrated plan is contrasted with a merged plan whereby doctors have merged or integrated their practices so that they are no longer in competition with each other. (FTC, *supra,* at p. I-1.)

[11] In accordance with Health and Safety Code section 1379, subdivision (a), rule 8 of the Provider Contract states that providers "make no charge to an eligible patient for any amount payable by CDS, or which would have been payable by CDS if a timely claim or request for prior authorization had been submitted to CDS, whether or not payment is made by CDS . . . ." Thus, if CDS fails to pay a participating dentist, the patient cannot be held liable for the payment.

[12] Appellants contend that the Federal Trade Commission policy that the per se standard not be applied to provider financed prepayment medical plans "obviously applies only to small provider groups. . . ." The distinction, however, between "small" and "large" provider groups is nowhere to be found in the Federal Trade Commission opinion or in the cases cited to this court by the parties.

sumptively legitimate enterprises," the Legislature apparently contemplated that antitrust challenges to health care provider groups would be judged under the rule of reason. Appellants have not shown that the Legislature's findings, which address precisely the considerations relevant to application of the rule of reason, were empirically incorrect.

### 3. The Cases on Which Appellants Rely Are Distinguishable

Appellants rely heavily on *Arizona* v. *Maricopa County Medical Society, supra,* 457 U.S. 332, where the Supreme Court struck down as per se unlawful an agreement between doctors which established a foundation to institute a medical prepayment plan.[13] There are two critical differences between *Maricopa* and this case. The main distinction is that in *Maricopa,* the foundation set the rates for services; here, individual dentists establish the rate. As noted in *Davidowitz* v. *San Diego County Dental Society, supra,* 1983-1 Trade Cases (CCH) at page 69,364, the CDS arrangement is not organized to set maximum fees, but rather is similar to "arrangements for the purchase of goods and services," as to which the Supreme Court has used the rule of reason test. The FTC statement, issued while *Maricopa* was pending in the Supreme Court, noted that the per se rule might be appropriate in *Maricopa* because "instead of creating a physician controlled plan to compete against other third-party payers, the physicians seem merely to have agreed upon maximum payment levels for insurers that wish to offer a plan approved by the physician groups." (FTC, *supra,* at p. I-6, fn. 45.)

A second difference is that in *Maricopa,* the doctors had no financial interest in the operation of the foundation; here, the dentists have a stake in CDS's financial well-being. Indeed, in distinguishing *Broadcast Music,* the court in *Maricopa* explained: "The foundations are not analogous to partnerships or other joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit. . . . The agreement under attack is an agreement among hundreds of competing doctors concerning the price at which each will offer his own services to a substantial number of consumers." (*Id.,* at pp. 356-357.)

Appellants also rely on *FTC* v. *Indiana Federation of Dentists, supra,* 476 U.S. 447. There, a unanimous court struck down an agreement of an organization of dentists not to turn over their patient x-rays to dental insurers. The insurers wanted the x-rays to determine for themselves whether the dentist had provided the least expensive method of treatment or whether

---

[13] The Legislature recognized that *Maricopa* "serves as a disincentive to the development of contracting for health care services" because of the exposure to antitrust liability. (Bus. & Prof. Code, § 16770, subd. (e).)

proposed treatment was necessary. (*Id.,* at p. 449 [90 L.Ed.2d at p. 451].) The court found it evident that the agreement was anticompetitive and without any procompetitive virtue. (*Id.,* at p. 459 [90 L.Ed.2d at p. 457].) Here by contrast, CDS is not facially anticompetitive, and both the Federal Trade Commission and the Legislature have recognized the procompetitive elements of plans such as CDS.

■■■ As the trial court recognized, application of the rule of reason does not necessarily mean the practice is permissible under the antitrust laws. We find, however, that the court correctly concluded that CDS did not violate such laws.[14]

## IV. *Nonwaiver of Copayment Provision*

### A. Appellants' Contentions

■ Appellants argue that the provision which precludes dentists from waiving the copayment results in inflated dental fees. Their argument, essentially, is that the copayment constitutes an overcharge. This is demonstrated by the fact that private insurance companies do not require dentists to collect the patient copayment, and that dentists who provide services to patients with private insurance often do waive the copayment.[15] Thus, a dentist who charges $100 for a service would only charge $80 in a competitive market, as shown by his or her willingness to waive the $20. Appellants also assert that the copayment inhibits price reductions by reducing the patient's incentive to seek out lower prices. For instance, where a plan calls for a 20 percent copayment, the patient will realize only $1 in savings for every $5 fee reduction.

---

[14] For the reasons stated by the trial court, we find that court correctly evaluated the evidence regarding the formation of CDS.

We also reject CDS's claim that because it provides only 15 percent of dental services in California, it has not the market power to violate the antitrust laws. The Federal Trade Commission has recognized that antitrust concerns are raised when a provider group comprises a "substantial majority" of a geographic area's pool of providers, especially where a group's plan depends on the collective action of the providers. (*FTC, supra,* at p. I-3, fn. 15, 49009.) This concern was also expressed in *Sausalito Pharmacy* v. *Blue Shield of California* (N.D.Cal. 1981) 544 F.Supp. 230, 237 and *Davidowitz, supra,* 1983-1 Trade Cases (CCH) at page 69,364.

[15] We note that it was submitted to the Attorney General that "an increasing number of dentists are now routinely waiving the patient's copayment in an effort to attract patients, and are openly communicating that willingness through advertising, through letters to individuals and groups, or through simple agreement with the patient." (64 Ops.Cal.Atty.Gen. 782, 783-784 (1981).) Appellants submitted declarations from dentists who declared that they would waive the copayment if CDS allowed them.

Respondent submitted declarations from dentists who stated that if they waived the copayment, they would have to compensate by raising their fees.

## B. The Trial Court's Opinion

The trial court rejected appellants' contentions on two grounds. First, there was no proof that the nonwaiver provision was anticompetitive. The provision does not constitute an agreement to fix prices. It does not mandate that dentists charge a certain fee. It states only that the patient's portion of the fee must be collected. Whether the dentist receives a percentage of his fee directly from the patient is a function of the subscriber contract, not his own fee. The court also stated that the evidence of whether independent prepayment plans police collection of the copayment as vigorously as does CDS was conflicting, but even if they do not, a lawful provision does not become unlawful merely because it is enforced.

The court admitted that the copayment reduces a patient's incentive to seek out the lowest price. However, this phenomenon is not particular to CDS, but rather arises from the fact that insurance dilutes the impact of price changes. If CDS paid 100 percent of the dentist's fee, then any patient incentive would be reduced further, or indeed, eliminated completely.

Second, the court concluded that the copayment does not constitute a compensable injury under the antitrust laws. The ban against waiving the copayment is simply the corollary of the rule that a dentist must report his true fee to CDS; if a dentist intends to waive the copayment, it is fraudulent for him to report to CDS that his fee includes the copayment. A patient does not suffer compensable damage simply because he or she is deprived of the ability to benefit from the dentist's misrepresentation.

## C. The Trial Court's Analysis Was Correct

The trial court's reasoning is sound and needs no amplification. We add only that the court's reasoning is consistent with case law. *Davidowitz* v. *San Diego Dental Society, supra,* 1983-1 Trade Cases, ¶ 65,231, 69,362, involved a similar challenge to CDS's practices. There, too, summary judgment was granted in favor of CDS. The court stated that "since the deductible [copayment] is not a part of the price, the fact a rule exists requiring collection of the deductible cannot amount to a conspiracy to fix prices nor price fixing *per se.*" (*Id.,* at p. 69,364.) Similarly, in *Sausalito Pharmacy* v. *Blue Shield of California, supra,* 544 F.Supp. at pages 233-234, the district court rejected an antitrust challenge to an agreement between insurance companies and pharmacies similar to the provider contract between CDS and dentists. Responding to plaintiff's challenge to a rule that the pharmacy not charge the insured more than the deductible, the court stated, "the amount of the deductible is not set in the participating pharmacy agreement, but rather in the agreement between the insurer and the beneficiaries.

The prohibition against charging the beneficiary more than the deductible is merely the mechanism utilized by the insurance companies to apply their deductibles in prepaid drug transactions. Thus, while the price of the drugs is indeed 'fixed' by the agreements, the deductible is not that price; the price 'fixed' in the pharmacy agreements is the cost of the drug plus the dispensing fee." Thus, plaintiff's contention merited analysis only insofar as it alleged that the total price, as opposed to the deductible, was fixed. (*Ibid.*)

The trial court's conclusion that the copayment does not constitute a measure of damages is also supported by *Tom* v. *Hawaii Dental Service* (D.Hawaii 1985) 606 F.Supp. 584, 586 and *Feiler* v. *New Jersey Dental Ass'n* (1983) 191 N.J. Super. 426 [467 A.2d 276, 49 A.L.R.4th 1219]. The court in *Tom* rejected a dentist's contention that enforcement of a nonwaiver of copayment provision violated the Sherman Act. The court quoted the following passage from *Feiler*: " 'Dental insurers are entitled to write policies containing copayment provisions. Whether or not copayment encourages more conservative use of dental services or achieves some other lawful goal, the carriers are entitled to write a copayment provision and to enforce it. If it is a socially undesirable provision, it is up to government to bar its use. It is not up to dentists to tiptoe around it by overbilling.' " (*Tom* v. *Hawaii Dental Service, supra,* 606 F.Supp. at p. 586, quoting *Feiler, supra,* 467 A.2d at p. 284.)

*Feiler* further observed that "[i]f the insurance payment were not assigned to Feiler, the patient would pay him and seek reimbursement from the carrier. If he had paid Feiler an agreed fee of $80 for a dental procedure, he could not truthfully submit to the carrier a statement that the fee was $100 in order to gain reimbursement of $80. There is no relevant difference between that case and the case in which the dentist, to whom benefits are assigned, states his fee to be $100 when he intends to be satisfied with a payment of $80." (*Feiler, supra,* 467 A.2d at p. 283.)

Thus, *Feiler* held that a state dental association could enjoin a dentist from submitting claims for his full fee even though he intended to waive the copayment because this practice constituted fraud against the insurance company. Other attorneys general have reached the conclusion that such advertising is false or misleading. (See e.g., Ops.Ga.Atty.Gen., Opn. No. 83-25 (1983); but see 64 Ops.Cal.Atty.Gen. 782, *supra*.)[16]

---

[16] The California Attorney General held that a dentist does not commit fraud by advertising that he or she will waive the copayment because the term " 'usual fee' " is so vague and outmoded that it could include the possibility of a fee amount not taking into account the waived portion. The Attorney General noted that the term " 'usual fee' " assumes a "unitary fee structure" whereas, in reality, a "dual pricing structure has arisen for dental care, differentiating between those who are insured and those who are not." (*Id.,* at p. 786.) Adver-

## V. *Usual Fee Rule*

### A. The Trial Court's Opinion

■ The trial court found that there was a factual question whether the usual fee rule, which requires that CDS patients not be charged more than non-CDS patients, was a restraint of trade. The court said that the fact that 90 percent of dentists were CDS members suggested that agreements between CDS and dentists could influence the price of dental services. The rule could discourage price cutting. The court found that the reasonableness of the price restraint was a question of fact.

The court went on, however, to find no evidence that the class was damaged by the restraint. First, as it previously explained, the copayments did not constitute an element of injury. Second, appellants presented no evidence that discounting to non-CDS patients would lead to lower fees to CDS patients. As far as the class was concerned, the usual fee rule could only inure to their benefit.

### B. The Parties' Contentions

Appellants' arguments are aimed at bolstering the court's conclusion that the usual fee rule is anticompetitive and leads to higher dental fees. Appellants do not directly attack the ruling that there were no damages. Respondents challenge the first part of the court's ruling on the ground that the provision is simply intended to prevent discrimination against CDS members. We need not consider respondents' contention because we agree with the trial court on the lack of a triable issue that appellants were damaged.

### C. The Trial Court's Analysis Was Correct

The court correctly found that the class was not injured by the usual fee rule. There was no evidence that the rule leads either to higher fees for dental patients as a whole or to CDS patients in particular. The only evidence of damages proffered were declarations that dentists do or would waive the copayment, but, as the court explained, prohibiting the waiver of the copayment does not result in compensable damage to patients. The fact that some dentists are willing to waive the copayment does not mean that dentists' fees are too high, but rather that some dentists will take advantage

tising that the dentist will waive the copayment is also not false or misleading because that is exactly what will occur. (*Id.*, at p. 789.)

It appears the difference between this opinion and those of other attorneys general and courts is that the former viewed the problem from the consumers' point of view whereas the latter addressed the question from the insurance company's perspective.

of the insurance companies' lax policy of enforcement of the waiver provision. Appellants offered no evidence that dentists not participating in CDS charge less than do CDS dentists, nor did they allege or attempt to prove that dentists are conspiring to set prices at an artificially high level.

As between CDS patients and non-CDS patients, the rule benefits CDS patients by ensuring that they will not be charged more than non-CDS patients. The rule does not prohibit a dentist from charging CDS patients less or from offering discounts to CDS patients. The only way in which the rule could harm CDS patients is by discouraging discounts to non-CDS patients. However, appellants offered no evidence that the rule is actually discouraging dentists from offering discounts to non-CDS patients. Moreover, the fact that discounts are not offered does not necessarily mean the price absent a discount is artificially high.

## VI. *Conclusion*

For the foregoing reasons, we find no error in the trial court's resolutions of the issues presented. We therefore affirm the court's grant of summary judgment.

Barry-Deal, J., and Merrill, J., concurred.

A petition for a rehearing was denied May 6, 1988, and appellants' petition for review by the Supreme Court was denied June 29, 1988. Mosk, J., was of the opinion that the petition should be granted.