**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 16-1468

———————

AETNA LIFE INSURANCE COMPANY,
Appellant

v.

HUNTINGDON VALLEY SURGERY CENTER;
FOUNDATION SURGERY AFFILIATES, LLC;
FOUNDATION SURGERY MANAGEMENT, LLC

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:13-cv-03101)
District Judge: Honorable Nitza I. Quiñones Alejandro

———————

Submitted Under Third Circuit LAR 34.1(a)
March 16, 2017

———————

Before: SHWARTZ, GREENBERG, <u>Circuit Judges</u>, and SIMANDLE, <u>Senior District Judge</u>.[*]

(Opinion Filed:  July 19, 2017)

———————

OPINION[**]

———————

SHWARTZ, <u>Circuit Judge</u>.

————————————

[*] Honorable Jerome B. Simandle, Senior District Judge of the United States District Court for the District of New Jersey, sitting by designation.
[**] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Aetna Life Insurance Company ("Aetna") sued Foundation Surgery Affiliates, LLC ("FSA"), and Foundation Surgery Management, LLC ("FSM") (collectively, "Defendants") for providing financial incentives, or kickbacks, to doctors to refer patients to Huntingdon Valley Surgery Center ("HVSC") and for engaging in fraudulent billing practices.[1]  The District Court granted partial summary judgment in favor of Defendants, holding that Defendants' conduct did not violate the anti-kickback or fraud provisions of Pennsylvania's insurance fraud statute, 18 Pa. Cons. Stat. § 4117(a), (b)(2).  Aetna Life Ins. Co. v. Huntingdon Valley Surgery Center, 129 F. Supp. 3d 160, 166-75 (E.D. Pa. 2015).  While the District Court correctly concluded that Defendants are not licensed health care providers and thus cannot be held liable under the anti-kickback provision, a genuine dispute of material fact exists as to whether it was fraudulent for HVSC to bill Aetna for the total price of patients' care without disclosing the fact that HVSC waived the patients' obligations for a portion of the bills and thereby reduced the actual cost. Thus, we will affirm in part, vacate in part, and remand for further proceedings.

I

A

Aetna is a health insurance provider that contracts with physicians and facilities to pay for health care services Aetna members receive.  When an Aetna member goes to a provider with whom Aetna has contracted (an "in-network" provider), the member pays a fixed fee, in the form of a co-payment or deductible, or a percentage of the total

---

[1] Aetna also sued HVSC, which has since settled with Aetna.

negotiated rate for the care, called "co-insurance." App. 585. When an Aetna member seeks care from a physician or facility that is outside of Aetna's network, the total cost of that care will generally be higher (since Aetna has not negotiated a price for it), and the member pays a higher fee.

Huntingdon Valley Surgery Center ("HVSC") is an outpatient surgical facility that is outside of Aetna's network. The twenty-two physicians who partly own HVSC are in Aetna's network. Thus, while the physicians' individual services are compensated at the in-network rates, the services HVSC provides are paid at the higher, out-of-network rates. Aetna asserts that the doctors receive a greater percentage of ownership based upon the number of surgeries they perform at HVSC, and that this gives the doctors an incentive to refer and treat their patients at HVSC as opposed to other facilities. Aetna contends that this arrangement violates Pennsylvania's anti-kickback provision under 18 Pa. Cons. Stat. § 4117(b)(2).

FSA also has an ownership interest in HVSC. FSA is a holding company that wholly owns FSM. FSM controls many of HVSC's daily operations through a chief administrator. Among other things, FSM recruits physicians, contracts with insurers, hires management staff, and obtains necessary licensing for HVSC.[2] FSM also maintains HVSC's "Chargemaster," which lists prices for all medical services offered there, regardless of who pays the bill.[3] App. 4, 164.

---

[2] FSM receives a percentage of HVSC's net revenues as a management fee.
[3] The Chargemaster is akin to the "list" price of a car; it sets forth an amount that omits, among other things, discounts negotiated by a particular purchaser, and thus does not reflect the actual amount the seller expects to receive.

Because Aetna and HVSC do not have an agreement governing billing, they use third-party companies to facilitate billing and payment for Aetna members who use HVSC. Almost all of the bills at issue in this case were processed through two "rental networks" named Beech Street Corporation and MultiPlan, Inc. App. 6. HVSC's contract with Beech Street states that, for bills processed through Beech Street's network, HVSC will be "reimbursed at 80% of usual billed charges, less applicable Copayments, Deductibles, and Coinsurance." App. 2253 ¶ I. The term "usual billed charges" is undefined. For bills processed through MultiPlan, HVSC will be reimbursed for 75% of "billed charges, less any Co-payment, Deductible, and/or Co-insurance, if any, specified in the Participant's Benefit Program." App. 823 ¶ 3.1. The term "billed charges" is defined as "the fees for a specified health care service or treatment routinely charged by [HVSC] regardless of payment source." App. 809 ¶ 1.2. The term "routinely charged" is not defined. On the other side of the transaction, Aetna entered into contracts with each rental network, agreeing to pay bills to out-of-network providers, discounted at the rates negotiated by the rental networks.

To bill Aetna, HVSC submits an industry-standard form that is also used for Medicaid and Medicare billing. The form only asks a provider to list "total charges" but does not define that term. App. 1121. Once Aetna receives a bill from HVSC, it multiplies the total charge by the discount rate negotiated by the rental agreement—80% for Beech Street and 75% for MultiPlan—and then subtracts the member's co-payment, deductible, or co-insurance obligations. Aetna then pays HVSC the remainder.

As part of its business plan, HVSC generally waives (or greatly reduces) Aetna members' co-payment, co-insurance, or deductible obligations. Because the patients' financial obligations are greater when they use an out-of-network provider, by waiving these amounts, Aetna members can obtain care at HVSC and pay approximately the same out-of-pocket fee they would pay at an in-network facility. Nonetheless, FSM sends bills to Aetna listing the full Chargemaster price for care provided to Aetna members, without informing Aetna that the patients' payment obligations have been waived.

B

Aetna sued Defendants alleging, among other things, that Defendants provided illegal kickbacks to the physician-owners, in violation of 18 Pa. Cons. Stat. § 4117(b)(2) (Count I), and that Defendants committed or aided and abetted the commission of insurance fraud in violation of § 4117(a) (Counts III and IV).[4] The District Court entered summary judgment in favor of Defendants on those claims. The District Court reasoned that Defendants could not be liable for providing illegal kickbacks under § 4117(b)(2) because they are not health care providers licensed by the Commonwealth of Pennsylvania, and that HVSC's billing practices were not fraudulent since it accurately listed its total charges on its bills to Aetna. We granted the request to consider on interlocutory appeal whether the District Court correctly ruled that (1) Defendants are not

---

[4] Aetna also brought claims for conspiracy to provide illegal kickbacks (Count II), tortious interference with contractual relations (Count V), breach of contract (Count VI), unjust enrichment (Count VII), equitable relief (Count VIII), and equitable accounting (Count IX). The District Court denied Defendants' motions for summary judgment with respect to Counts II and V, and those claims are still before the District Court.

"health care providers" under the anti-kickback provision and (2) HVSC's billing

practices are not fraudulent.

II[5]

A

The anti-kickback provision of Pennsylvania's insurance fraud statute,

§ 4117(b)(2), applies only to a "health care provider."[6] The question before us is whether

Defendants are "health care providers" under the statute.[7]

---

[5] The District Court had jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction pursuant to 28 U.S.C. § 1292(b). "In reviewing an interlocutory appeal under 28 U.S.C. § 1292(b), this court exercises plenary review over the question certified." Florence v. Bd. of Chosen Freeholders of Burlington, 621 F.3d 296, 301 (3d Cir. 2010) (citation omitted), aff'd, 566 U.S. 318 (2012).

Here, we are conducting a plenary review of the District Court's order granting summary judgment. Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

[6] Section 4117(b)(2) provides:

> With respect to an insurance benefit or claim covered by this section, a health care provider may not compensate or give anything of value to a person to recommend or secure the provider's service to or employment by a patient or as a reward for having made a recommendation resulting in the provider's service to or employment by a patient; except that the provider may pay the reasonable cost of advertising or written communication as permitted by rules of professional conduct. Upon a conviction of an offense provided for by this paragraph, the prosecutor shall certify such conviction to the appropriate licensing board in the Department of State which shall suspend or revoke the health care provider's license.

18 Pa. Cons. Stat. § 4117(b)(2).

6

Because the Pennsylvania courts have not addressed the meaning of the term "health care provider," we turn to the Pennsylvania rules of statutory construction. Pursuant to the rules, the object of interpreting the statute is to effectuate the intent of the General Assembly. 1 Pa. Cons. Stat. § 1921(a). To glean the legislature's intent, we must start with the text. The rules of construction specifically state that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded." Id. § 1921(b); see also Commonwealth v. Jarowecki, 985 A.2d 955, 959 (Pa. 2009). When the language in question does not include technical phrases, we construe it "according to [its] common and approved usage," 1 Pa. Cons. Stat. § 1903(a), and in a manner that avoids surplusage, id. § 1922(2).

The insurance fraud statute describes different types of wrongful conduct and identifies actors whose conduct is covered. It addresses insurance fraud by any "person," including an "insurer" or "owner, administrator, or employee of any health care facility." 18 Pa. Cons. Stat. § 4117(a). It also prohibits "health care providers" from giving anything of value, or kickbacks, to a person to persuade a patient to use a particular service. Id. § 4117(b). By specifically identifying health care providers in one provision and administrators in another, the Pennsylvania legislature recognized the distinction between providers and administrators. An administrator differs from and thus does not qualify as a "health care provider" under the statute.

---

[7] Because the question on appeal is whether Defendants qualify as "health care providers" under the anti-kickback provision in the first place, we need not decide whether Defendants paid kickbacks.

The plain language definition of the term "health care provider" also shows that it is different from an administrator or manager. In ordinary usage, a "health care provider" is a person or entity that is qualified to render medical care to patients.[8] Because an administrator or manager does not render medical care, she is not, by plain definition, a provider.

The statute's language further identifies a characteristic of a "health care provider." The final sentence of the anti-kickback provision envisions that a health care provider is licensed as reflected by the fact that it mandates that its licensing board be notified of a conviction under this statute. 18 Pa. Cons. Stat. § 4117(b)(2) ("Upon a conviction of an offense provided for by this paragraph, the prosecutor shall certify such conviction to the appropriate licensing board in the Department of State which shall suspend or revoke the health care provider's license."). This sentence reflects the limited category of actors to which the provision applies.[9] Thus, by its text, the anti-kickback provision applies only to licensed health care providers.[10, 11]

---

[8] See e.g., Provider, Stedman's Medical Dictionary 732090, Westlaw (database updated November 2014) (defining "provider" as a "term used by managed care organizations, referring to anyone rendering medical care, including physicians, nurse practitioners, physician assistants, and others"); Provider, McGraw-Hill Concise Dictionary of Modern Medicine (2002), http://medical-dictionary.thefreedictionary.com/provider (defining "provider" as a "person-e.g., doctor, nurse, nurse practitioner, or institution-e.g., hospital, clinic, or lab that provides medical care").

[9] This sentence applies only to criminal charges brought under the anti-kickback provision. Taken with § 4117(g), which allows a party to bring a private right of action, § 4117(b)(2) can be used to pursue both criminal and civil actions. The single provision should be construed consistently. See Commonwealth v. Monumental Props., Inc., 329 A.2d 812, 817 (Pa. 1974); cf. Leocal v. Ashcroft, 543 U.S. 1, 12 (2004) (noting that "we must interpret the statute consistently, whether we encounter its application in a criminal

8

Applying these rules of construction,[12] we conclude that a "health care provider"

under § 4117(b)(2) is limited to persons or entities licensed to perform health care

services.  Defendants perform managerial and administrative tasks at HVSC but they do

not care for patients.  Moreover, Defendants are not entities licensed to perform health

---

or noncriminal context").  Thus, the rule of lenity, which applies to criminal statutes, would also apply to the use of the statute in the civil context.  See 1 Pa. Cons. Stat. § 1928(b)(1) (stating that penal statutes must be "strictly construed"); Hartford Steam Boiler Inspection v. Int'l Glass Prod., LLC, Civ. No. 2:08-cv-1564, 2016 WL 5468111, at *16 (W.D. Pa. Sept. 29, 2016) (applying the rule of lenity to construe a provision of § 4117 in a civil action since "any ambiguities in the statute should be interpreted strictly and consistently in both the criminal and the civil context").  Under the rule of lenity, ambiguity is resolved in favor of the defendant, which in this case means that the statute should be construed to cover only those who plainly fall within the text.  Applying the rule of lenity here means that the term "health care provider" should be strictly construed to cover those who are licensed to render medical care.

[10] Aetna's contracts with the rental networks similarly define "providers" as licensed people or entities.  Its contract with MultiPlan defines a "provider" as "[a] duly licensed and qualified physician or any other health care professional."  App. 1549 ¶ 1.22.  Aetna's contract with Beech Street defines a "Participating Entity Provider" as "[a] duly licensed and qualified health care provider (including, but not limited to, a physician, facility, or hospital) . . . ."  App. 1504 ¶ 11.11.

[11] Though Aetna argues that § 4117(b)(2) should be defined in pari materia with the definition of a "health care provider" in the the Health Care Facilities Act ("HCFA"), 35 Pa. Cons. Stat. § 448.103, the doctrine is not applicable here because it applies where the statutes "relate to the same persons or things or to the same class of persons or things," 1 Pa. Cons. Stat. § 1932, and these statutes do not relate to the same things.  HCFA relates to increasing efficiency, innovation and competition in the health care market, where § 4117 seeks to combat insurance fraud.  See Rehab Hosp. Servs. Corp. v. Health Sys. Agency of Sw. Pa., 475 A.2d 883, 886 (Pa. Cmmw. Ct. 1984) (stating that the purposes of the HCFA include increasing economic efficiency, innovation, and competition in the health care market); see also 40 Pa. Stat. §§ 325.2, 325.3 (stating that the purpose of civil enforcement of § 4117 is to "prevent, combat and reduce insurance fraud, to improve and support insurance fraud law enforcement and administration and to improve and support insurance fraud prosecution").

[12] Since the text of the statute is not ambiguous, we do not look beyond the text to discern its meaning.  1 Pa. Cons. Stat. § 1921(b), (c); see also Jarowecki, 985 A.2d at 959.

care activities.[13]  As a result, the District Court correctly concluded that Defendants are not health care providers under § 4117(b)(2)'s anti-kickback provision.

B

We next consider whether HVSC's billing practices constitute fraud under § 4117(a).  The fraud provision provides that:

> [a] person commits an offense if the person . . . [k]nowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim.

18 Pa. Cons. Stat. § 4117(a)(2); see id. § 4117(g) (providing for a private right of action for insurers).  By prohibiting insurance claims that contain "false, incomplete or misleading information," the statute bars both fraudulent "acts" and "omissions." Montgomery v. Fed. Ins. Co., Civ. A. No. 92-0041, 1992 WL 185599, at *2 (E.D. Pa. July 23, 1992); see also Hepps v. Gen. Am. Life Ins., Civ. A. No. 95-5508, 1998 WL 564497, at *4 (E.D. Pa. Sept. 2, 1998).  Thus, liability can arise from either the misrepresentation or concealment of information material to a claim.  See Montgomery, 1992 WL 185599, at *2.

---

[13] Aetna contends that FSM and FSA are licensed entities because they operate a licensed facility.  To support this claim, Aetna relies on various statutes that specifically include operators of health care facilities in their definitions of health care providers.  See 35 Pa. Cons. Stat. § 448.103 (HCFA); 62 Pa Cons. Stat. § 1401-C (eHealth Partnership Program); and 63 Pa. Cons. Stat. § 425.2 (Peer Review Protection Act).  These statutes merely show that in some contexts the legislature may determine that non-licensed entities that operate licensed facilities qualify as health care providers.  The statutes do not state that a non-licensed entity working with a licensed provider is itself licensed.  There is nothing in the record before us showing that FSA and FSM have licenses from any governmental agency.

The issue on appeal is whether HVSC's bills to Aetna either misrepresent or conceal information where they list the total Chargemaster prices without disclosing the fact that HVSC routinely waives the patients' fees and so would not collect the listed Chargemaster prices. The answer to this question depends on HVSC's disclosure obligations in the first place, which arise from the language of the billing forms it submits to Aetna and any contracts clarifying the forms' terms. See Am. Fed'n of State, Cty. and Mun. Emps. Dist. Council 37 Health & Sec. Plan v. Bristol-Myers Squibb Co., 948 F. Supp. 2d 338, 350-51 (S.D.N.Y. 2013) (noting that "health insurers may create contracts that relieve them of the duty to pay physicians and dentists who routinely waive co-pays" and that whether "routine and hidden waiver of co-pays . . . states a claim for fraud" depends on the existence of a contractual obligation proscribing that practice); Feiler v. N.J. Dental Ass'n, 467 A.2d 276, 281 (N.J. Super. Ct. Ch. Div. 1983) (finding dentist's practice of routinely waiving co-payments and failing to disclose waivers to insurers fraudulent where insurer billing forms "call[ed] for the dentist to set forth his actual charges to the patient"), aff'd, 489 A.2d 1161 (N.J. Super. Ct. App. Div. 1984).[14]

_____

[14] Case law supports the conclusion that whether or not the conduct here is fraudulent depends on HVSC's contractual obligations and an interpretation of the billing form. Aetna relies on five district court opinions from various jurisdictions that allowed fraud claims to survive motions to dismiss since the insurer-plaintiffs alleged sufficient facts to establish that the providers had a duty to bill for their actual charges and committed fraud by failing to disclose routine waivers of patient fees. See Tri State Advanced Surgery Ctr., LLC v. Health Choice, LLC, 112 F. Supp. 3d 809, 816 (E.D. Ark. 2015); Conn. Gen. Life Ins. Co. v. True View Surgery Ctr. One, LP, 128 F. Supp. 3d 501, 506 (D. Conn. 2015); Conn. Gen. Life Ins. Co. v. Advanced Surgery Ctr. of Bethesda, LLC, No. 14-cv-2376, 2015 WL 4394408 (D. Md. July 15, 2015); Almont Ambulatory Surgery Ctr., LLC v UnitedHealth Grp., 121 F. Supp. 3d 950, 971-79 (C.D. Cal. 2015); Nutrishare, Inc. v. Conn. Gen. Life Ins. Co., No. 13-cv-2378, 2014 WL

11

Viewing the facts in a light most favorable to the nonmovant, the form HVSC uses to bill Aetna is ambiguous as to HVSC's disclosure obligations. The form asks the provider to list "total charges" and does not specify whether that term refers to the list prices or amount the provider actually expects to receive (before the insurer deducts its negotiated discount rate). App. 1121. If the list price is all that the form requires, then HVSC has no obligation to disclose the fact that it routinely waives patient fees. If, on the other hand, HVSC is required to disclose the amount it actually expects to be paid before the insurer deducts its discount rate, then it has a duty to deduct any routine waivers it provides to patients from the "total charges" on the bill. Under this view, when HVSC waives the patients' obligations for portions of the bills, it reduces the amount of money it is actually going to receive for services provided, and so HVSC would need to deduct the waived obligations from its bill to honestly represent its expected payment.

---

1028351, at *4 (E.D. Cal. Mar. 14, 2014). These motions to dismiss survived because the plaintiffs alleged that the billing forms required the providers to list their actual charges; that is, the fraud arose because, accepting plaintiffs' allegations as true, the district courts determined that the providers' billing practices did not, as a factual matter, accord with their disclosure obligations. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (stating that in reviewing a motion to dismiss, a district court must accept all of plaintiffs' factual allegations as true and determine if they state a claim for relief.).

Similarly, decisions by the Courts of Appeals for the Seventh and Ninth Circuits establish that insurers can prevent routine waivers of patient fees through contract. See Davidowitz v. Delta Dental Plan of Cal., Inc., 946 F.2d 1476, 1481 (9th Cir. 1991) (holding enforceable a contract clause that stopped insurer benefits from being assigned to providers in order to prevent co-payment waivers); Kennedy v. Conn. Gen. Life Ins. Co., 924 F.2d 698, 702 (7th Cir. 1991) (stating that determining whether or not providers may waive co-payments is a matter of contract). Though both decisions warn of negative economic effects of routine and hidden fee waivers, both indicate that preventing such waivers is a matter of contract (in the absence of an explicit statutory directive).

Either interpretation of the billing form is plausible.  The form is the same one used for Medicaid billing, and this fact might indicate that providers are required to list the amount the provider actually expects to be paid.  See 42 U.S.C. § 1320a-7a(i)(6) (imposing civil penalties for routine waivers of Medicaid co-insurance and deductible obligations); Publication of OIG Special Fraud Alerts, 59 Fed. Reg. 65372-01 (Dec. 19, 1994) (stating that failing to disclose routine waivers of co-payment obligations constitutes Medicaid fraud since providers were expected to disclose their "actual charges" on billing forms).  On the other hand, the language of the form—requesting only the "total charges"—as well as the fact that the form specifies that routine waivers are not permitted for a specific government health benefit program, but making no mention of waivers for other types of claims, may indicate that the form does not require the disclosure of waivers of co-payments, co-insurance, and deductibles for private health insurance claims.  Thus, the form is ambiguous as to whether HVSC is permitted to present its list price, as it does by setting forth the Chargemaster rate, or is required to disclose the actual payment it expects to receive (before the insurer deducts its discount rate).

Moreover, HVSC's rental network contracts do not clarify what information it is required to disclose on the billing form and thus do not resolve the ambiguity.  HVSC's contract with MultiPlan states that the Center should bill the insurer for "fees for a specified health care service or treatment routinely charged by [HVSC] regardless of payment source."  App. 809 ¶ 1.2.  The Beech Street contract states that HVSC "will bill [insurers] directly at Provider's usual billed charges for Covered Services furnished by

13

Provider." App. 2247 ¶ 4.1. Whether "usual" or "routine[]" charges refer to the actual amount HVSC generally expects to be paid or its list prices is ambiguous. See Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 93 (3d Cir. 2001) ("[A] contract will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning." (citation omitted)).

Since both the billing form and contracts are ambiguous as to HVSC's disclosure obligations, there is an issue of fact as to whether it submits fraudulent bills when it lists its Chargemaster rates as its "total charges" without deducting the waived patient fees from that figure or informing Aetna that it routinely provided such waivers. Thus, the District Court erred in concluding that HVSC's billing practices are not fraudulent as a matter of law. See Trizechahn Gateway LLC v. Titus, 976 A.2d 474, 483 (Pa. 2009) (deciding the meaning of an ambiguous contract clause is an issue of fact). As a result, we will vacate the District Court's order granting summary judgment with respect to Counts III and IV.[15, 16]

III

---

[15] We express no opinion regarding whether Aetna has produced sufficient evidence to survive summary judgment on the other elements of the fraud and aiding and abetting claims.

[16] The meaning of the ambiguous term will be for the jury. Whether there is sufficient evidence to resolve the ambiguity in Aetna's favor, or whether the ambiguity eliminates the presence of an intent to defraud is not for us to decide.

For the foregoing reasons, we will affirm the District Court's order granting summary judgment with respect to Count I and vacate and remand with respect to Counts III and IV.